DECISION
{¶ 1} Relator, Xerox Corporation, commenced this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting permanent total disability ("PTD") compensation to respondent Rita K. Diamond ("claimant"), and to enter an order denying said compensation. Relator also requests that the writ order the commission to vacate its 30 percent allocation of the award to relator and to enter an amended order that reallocates the award.
 {¶ 2} This court referred the matter to a magistrate of this court, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate concluded that "(1) Dr. [Charles] May's failure to sign the March 2, 2001 report does not require its evidentiary elimination; (2) the [staff hearing officer's] statements regarding the allowed psychological condition do not fatally flaw the PTD award; and (3) the commission did not abuse its discretion by allocating 30 percent of the award to claim number OD26505-22." (Magistrate's Decision, ¶ 27.) In light of his conclusions, the magistrate recommended that this court deny relator's request for a writ of mandamus. Relator has filed four objections to the magistrate's decision, and the matter is now before this court for a full, independent review.
 {¶ 3} By its first objection, relator argues that the magistrate improperly denied the requested writ of mandamus on the basis that relator did not raise its objections to Dr. May's report at the administrative level and thereby failed to preserve the issue for review in mandamus. Dr. May's report was submitted in support of claimant's application for PTD compensation. In this action, relator challenges Dr. May's report on the grounds that the report was not signed by Dr. May. In addressing this issue, the magistrate relied upon State ex rel. Quarto MiningCo. v. Foreman (1997), 79 Ohio St.3d 78, for the principle that issues not raised administratively are barred from review in mandamus. The magistrate resolved that, in view of the record before this court, relator did not administratively raise the issue, and, therefore, relator failed to preserve the issue for review in mandamus. Consistent with the magistrate, we find no evidence in the record showing that relator raised the issue before the commission. Therefore, we find relator's first objection to the magistrate's decision to be unpersuasive.
 {¶ 4} Under its second objection, relator argues that the magistrate improperly concluded that the report of Dr. May constituted some evidence upon which the commission could rely in awarding PTD compensation. In support of its second objection, relator essentially sets forth the same arguments that were considered and addressed by the magistrate in his decision. After thoroughly analyzing the issue, the magistrate determined that, even if relator had administratively raised the issue, Dr. May's failure to sign the report does not require its evidentiary elimination. For the reasons provided in the magistrate's decision, we do not find relator's second objection to be persuasive.
 {¶ 5} Relator argues in its third objection that the magistrate incorrectly interpreted the medical evidence. Relator maintains that the SHO order "fails to cite any evidence supporting its conclusion regarding Claimant's psychological condition." (Relator's memorandum in support of objections, at 6.)
 {¶ 6} In this case, claimant applied for PTD compensation, and the commission awarded the PTD compensation and allocated the award between two industrial claims. As pertinent to relator's third objection, the SHO stated, in addressing the PTD award, that "the claimant has disability attributable to her allowed psychological condition." In addressing allocation, the SHO noted "the limitations caused by her psychological condition." The SHO's order granting PTD compensation states that it is based "particularly" upon the report of Dr. May.
 {¶ 7} In his March 2, 2001 report, Dr. May recognized that claimant "sees Dr. Edmond Goold, a psychiatrist, for her dysthymia, and Dr. Goold prescribes medication for her dysthymic disorder." Dr. May further stated that claimant "has a long list of complaints and symptoms all compatible with depression." In the concluding paragraph in his report, Dr. May opined that claimant is permanently and totally disabled as a "result of the allowed conditions in all the above claims." "Aggravation of pre-existing dysthymia" is listed as an allowed condition of one of the claims.
 {¶ 8} In his decision, the magistrate resolved that the "SHO's statement `the claimant has disability attributable to her allowed psychological condition,' is neither inaccurate nor an abuse of discretion." (Magistrate's Decision, at ¶ 49.) The magistrate reasoned that Dr. May's statement that claimant's complaints and symptoms are compatible with depression "can be read as a finding that claimant suffers from depression based upon her complaints and symptoms." (Magistrate's Decision, at ¶ 47.) Relator's objection to the contrary, we concur with the magistrate and find that it would be reasonable to interpret Dr. May's report as attributing claimant's depression to the allowed psychological condition that contributes to her inability to perform all sustained remunerative employment.
 {¶ 9} Relator also argues in its third objection that the magistrate "misinterpreted" the medical evidence relating to the allowed condition of bilateral carpal tunnel syndrome, which was assigned claim number OD26505-22. Relator challenges the commission's allocation of 30 percent of the PTD award to claim number OD26505-22. Relator argues that "there is no objective medical evidence in the record to indicate that the restrictions noted by Drs. [James] Rutherford and [Robin] Stanko are related to the allowed condition of bilateral carpal tunnel syndrome," and that there is no evidence in the record indicating that claimant "is completely prohibited from performing all repetitive hand manipulation." (Relator's memorandum in support of objections, at 8.) Dr. Rutherford's report states that "[i]t is my medical opinion that [claimant] can do no continuous production type activities that involve rapid or repetitive, flexion, and extension of her wrists and hands." Dr. Stanko opined that claimant "could perform work at sedentary work levels with occasional repetitive hand restrictions bilaterally."
 {¶ 10} Upon review, we find that the SHO order sufficiently discussed the allocation of the PTD award in terms of the factors contributing to claimant's inability to engage in any form of sustained remunerative employment. In consideration of the limits on claimant's ability to use her hands, the SHO allocated 30 percent of the PTD award to claim number OD26505-22, which, as stated above, related to the allowed condition of bilateral carpal tunnel syndrome. As the record contains some evidence to support the commission's allocation of the 30 percent of the award to claim number OD26505-22, we conclude that the commission did not abuse its discretion in that regard.
 {¶ 11} Based on the foregoing, we find relator's third objection to the magistrate's decision to lack merit.
 {¶ 12} Lastly, in its fourth objection, relator argues that the magistrate, in analyzing the commission's determination, improperly relied upon the report of Dr. Rutherford. According to relator, Dr. Rutherford's report had been previously rejected by the commission, and pursuant to State ex rel. Zamora v. Indus.Comm. (1989), 45 Ohio St.3d 17, it could not be subsequently relied upon, to any extent, by the commission. "In Zamora, the Ohio Supreme Court held that the commission could not revive reports from doctors which the commission had implicitly rejected in rendering an order granting or denying compensation or allowing/disallowing certain conditions." State ex rel. Longwellv. Indus. Comm., Franklin App. No. 04AP-183, 2004-Ohio-6525, at ¶ 19. That holding does not apply when the report is found deficient in an interlocutory order. See id.
 {¶ 13} Here, the SHO, in an interlocutory order, found Dr. Rutherford's report to be technically defective because he failed to consider a newly allowed condition, namely "aggravation of preexisting lumbar degenerative disc disease." As a result of that determination, the SHO ordered a new physical examination on all the allowed physical conditions in all four claims. Because the commission found the report to be deficient in an interlocutory order, Zamora does not apply. See Longwell. As such, relator's argument, that Dr. Rutherford's report could not be relied upon because the commission had previously rejected the report, lacks merit. Accordingly, we find relator's fourth objection to the magistrate's decision to be unpersuasive.
 {¶ 14} Following our independent review of this matter, we find that the magistrate has properly discerned the pertinent facts and applied the relevant law to those facts. Thus, we overrule relator's objections, and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objections overruled; writ denied.
Klatt, P.J. and McGrath, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. Xerox Corporation, : :
Relator, : :
v. : No. 05AP-140 :
Industrial Commission of Ohio : (REGULAR CALENDAR) and Rita K. Diamond, : :
Respondents. : :
 MAGISTRATE'S DECISION Rendered on August 23, 2005 Vorys, Sater, Seymour and Pease LLP, Theodore P. Mattis andBethany R. Thomas, for relator.
Jim Petro, Attorney General, and Lasheyl N. Sowell, for respondent Industrial Commission of Ohio.
Agee, Clymer, Mitchell Laret, and Robert M. Robinson, for respondent Rita K. Diamond.
 IN MANDAMUS {¶ 15} In this original action, relator, Xerox Corporation, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting permanent total disability ("PTD") compensation to respondent Rita K. Diamond, and to enter an order denying said compensation. Relator also requests that the writ order the commission to vacate its 30 percent allocation of the award to relator and to enter an amended order that reallocates the award.
Findings of Fact:
 {¶ 16} 1. Respondent Rita K. Diamond ("claimant") sustained two industrial injuries while employed with relator, a self-insured employer under Ohio's workers' compensation laws. Her May 31, 1985 injury is allowed for "ilio lumbar ligament sprain," and is assigned claim number 890769-22. Her June 12, 1985 injury is allowed for "bilateral carpal tunnel syndrome," and is assigned claim number OD26505-22.
 {¶ 17} 2. Claimant has sustained two other industrial injuries while employed with other employers. Her July 23, 1990 injury is allowed for "disorder of sacrum; sprain lumbosacral; sprain lumbar region," and is assigned claim number 90-41428. Her August 13, 1990 injury is allowed for "sprain cervical; sprain lumbar; aggravation of pre-existing dysthymia; aggravation of pre-existing lumbar degenerative disc disease," and is assigned claim number 90-48974.
 {¶ 18} 3. On July 9, 2001, claimant filed an application for PTD compensation. In support, claimant submitted a medical report dated March 2, 2001. The report contains the typewritten name for the signature of Charles May, D.O.; however, the handwritten signature of Brant Holtzmeier, D.O., appears immediately above Dr. May's typewritten name. After his handwritten signature, Dr. Holtzmeier wrote: "for Charles May DO." The report is typewritten on the letterhead of "Grandview Family Practice, Inc." Drs. May and Holtzmeier are listed on the letterhead as physicians who practice at Grandview Family Practice, Inc.
 {¶ 19} 4. The March 2, 2001 medical report states:
* * * I have treated Ms. Diamond mainly for claim 90-48974. In addition, she sees Dr. Edmond Goold, a psychiatrist, for her dysthymia, and Dr. Goold prescribes medication for her dysthymic disorder.
Currently, Ms. Diamond complains of low back pain with shooting pain and paresthesias in both legs. She has no bowel or bladder dysfunction. She complains that her hands tighten up and complains of loss of dexterity in both hands. She is right hand dominant. She complains of loss of strength in both hands. She has shooting paresthesias into both hands which she describes as being similar to the time prior to her carpal tunnel surgeries. She has a long list of complaints and symptoms all compatible with depression. She states that she falls a lot and uses a quad cane to ambulate.
Physical examination reveals an overweight 54-year-old female. Height 5 feet 7 inches and weight 172 pounds. She stands with the lumbar spine held at a flexed position. Her iliac crest were of equal height. Shoulders were held at equal height. There is straightening of normal lumbar lordosis with exaggeration of normal dorsal kyphosis.
There is tenderness throughout the cervical dorsal and lumbar paraspinals. She could flex the cervical spine to 30 degrees and extend to 20 degrees. Right and left rotation are accomplished to 30 degrees and right and left lateral flexion to 10 degrees. She could flex the lumbar spine to 30 degrees, extend to neutral. Right and left lateral flexion were accomplished to 10 degrees. Achilles reflexes absent on the left and ¼ on the right. Patellar reflexes are 2/4 and equal bilaterally. There is no muscle atrophy noted in the lower extremities. Sensory exam is intact. Muscle strength grades 4/5 and equal in both lower extremities. There are barely visible carpal tunnel surgical scars over the volar aspect of each wrist. There is no muscle atrophy in the upper extremities. Tinel's is negative as well as Phalen's negative bilaterally.
Neurocirculatory exam in both upper extremities is intact. Range of motion of both wrists and in all digits were satisfactory bilaterally.
Grip strength was diminished on the right compared to the left side.
* * * [I]t is my medical opinion that Rita Diamond is permanently and totally disabled from any form of substantial gainful employment as a direct and proximate result of the allowed conditions in all the above claims. * * *
 {¶ 20} 5. On September 26, 2003, claimant was examined at relator's request by Gerald S. Steiman, M.D. Dr. Steiman reported:
OPINION: When considering the allowed conditions within Claims 890769-22 and OD26505-22, Ms. Diamond's history, medical record review, physical examination and pain assessment provide strong credible evidence that she is able to return to sustained remunerative employment.
Ms. Diamond's history, medical record review, physical examination and pain assessment fail to demonstrate evidence which would preclude her from returning to her prior job activity as it relates to the allowed conditions within Claims 890769-22 and OD26505-22.
The Fifth Edition of the Guides to the Evaluation of PermanentImpairment recommends the Diagnosis Related Estimate (DRE) methodology to evaluate an individual's whole body impairment due to a distinct injury. Use of the Range of Motion (ROM) methodology is limited to a few select conditions: (a) multi-level involvement or loss of joint segment integrity at multiple levels in the same spinal region, (b) recurrent radiculopathy in the same spinal region, (c) multiple injuries causing alteration of motion segment integrity or radiculopathy in the same spinal region, or (d) nontraumatic diagnoses. Accordingly, I have utilized the DRE methodology to determine the whole body impairment.
Presently, Ms. Diamond demonstrates evidence consistent with a Diagnosis Related Estimate Category II impairment of the lumbosacral spine. When apportioning this impairment to the allowed conditions within Claim 890769-22, Ms. Diamond's history, medical record review, physical examination and pain assessment provide credible evidence to support a 0-1% permanent partial impairment of the body as a whole.
When considering the allowed condition of bilateral carpal tunnel syndrome within Claim OD26505-22, Ms. Diamond's history, medical record review, physical examination and pain assessment provide credible evidence to support the presence of a Grade IV sensory impairment and a Grade IV motor impairment of the upper extremities due to median nerve compromise below mid forearm (Table 16-10, 16-11; Page 482, 484). Therefore, Ms. Diamond demonstrates evidence consistent with a 3% permanent partial impairment of the body as a whole when restricting my opinions to the allowed condition of bilateral carpal tunnel syndrome within Claim OD26505-22.
(Emphasis sic.)
 {¶ 21} 6. On November 13, 2003, claimant was examined at the commission's request by orthopedist James Rutherford, M.D. Dr. Rutherford wrote:
It is my medical opinion that Ms. Rita K. Diamond has a 12% permanent partial impairment of the whole person as a result of Claim No. OD26505-22. This is based on a mild left carpal tunnel syndrome on the left side and a mild right carpal tunnel syndrome on the right side. References for this are found in Table 16 on Page 57 of the AMA Guides to the Evaluation of Permanent Impairment, 4th Edition. It is also my medical opinion that Ms. Diamond has a DRE Category II impairment of the lumbosacral spine and this equates to a 5% permanent partial impairment of the whole person with the reference being Table 72 on Page 10. I am attributing 3% of this to Claim No. 890769-22. Ms. Diamond was off work for approximately 1 year and 8 months following this injury which was allowed for a ilio-lumbar ligament strain and the injury occurred in 1985. I am attributing the other 2% to Claim No. 90-41428 with the date of injury of 7/23/90. Ms. Diamond thus has a 2% impairment related to Claim No. 90-41428 and she has a 3% impairment related to Claim No. 890769-22. I am attributing none of the lower back impairment to Claim No. 90-48974. In addition, Ms. Diamond has a 5% permanent partial impairment related to a DRE Category II impairment of the cervical spine with the reference being Table 73 on Page 110. I am attributing this impairment to Claim No. 90-48974. I am giving no opinion concerning the psychological claim allowance for this claim. It is thus my opinion that concerning the orthopedic claim allowances of Claim No. 90-48974, that Ms. Diamond has a 5% permanent partial impairment. The combined value of these impairments of 12% for Claim No. OD26505-22 and 2% for Claim No. 90-41428 and 3% for Claim No. 890769-22 and 5% for Claim No. 90-48974 equates to a combined value of a 20% permanent partial impairment of the whole person as a result of the orthopedic claim allowances of the four claims under consideration. The reference for this is the Combined Value Charts on Page 322.
Because of the above described orthopedic impairments related to the orthopedic claim allowances of the four claims under consideration, it is my medical opinion that Ms. Diamond has some functional limitations. It is my medical opinion that she can do no continuous production type activities that involve rapid or repetitive, flexion, and extension of her wrists and hands. She is able to use her hands however, for activity of daily living type activities frequently. She can lift and carry up to 10 lbs when considering her orthopedic claim allowances related to the claims only. Concerning only those orthopedic claim allowances she can do no stooping or bending below knee level, or climbing or crawling for work activity. She could drive for her own transportation but she cannot drive heavy equipment.
Ms. Diamond has some significant other medical conditions unrelated to the industrial claim allowances of the claims under consideration which also contribute to her level of functional activity. Ms. Diamond had a fracture of her left knee that required open reduction and internal fixation approximately three years ago and she lacks 10 degrees of extension of the left knee with only 45 degrees of flexion. She has 8 degrees of valgus of the left knee. This significantly affects her ambulation. She also has a history of a club foot on the left side with a high arch of that foot, and the left foot is 1 inch shorter than the right foot. She has calluses under the plantar surface of both feet. She had a vascular ulcer on the medial aspect of the right lower leg which is now healed. She has limitation of motion of the right ankle with only 5 degrees of dorsiflexion and 15 degrees of eversion. She has had a diagnosis of rheumatoid arthritis and this has caused her to have some tenderness over the metacarpal phalangeal joints of the 2nd and 3rd
fingers of both hands and the PIP joints of both hands, but this also is unrelated to the industrial claim allowances. She also has mild thoracolumbar scoliosis. She has limitation of motion of both shoulders with only 120 degrees of flexion and 120 degrees of abduction and this is probably due to her generalized arthritis. She stated that she has been told that she has osteoporosis and she has degenerative joint disease of the lower back, but this is not attributable to her orthopedic claim allowances of the claims under consideration.
* * *
* * * Based only on the orthopedic claim allowances of the four claims under consideration and the orthopedic evaluation related to those claim allowances, it is my medical opinion that Ms. Rita K. Diamond is capable of physical work activity and I have indicated on the Physical Strength Rating form that she is limited to sedentary work activity.
 {¶ 22} 7. Following a February 20, 2004 hearing, a staff hearing officer ("SHO") issued an interlocutory order finding that Dr. Rutherford's report "is defective as he failed to examine the claimant with respect to the additionally allowed condition of `aggravation of preexisting lumbar degenerative disc disease' * * * in claim 90-48974." The SHO ordered a "new physical examination on all the allowed physical conditions in all 4 claims."
 {¶ 23} 8. Pursuant to the SHO's interlocutory order, claimant was examined at the commission's request by Robin G. Stanko, M.D. Dr. Stanko wrote:
OPINION: From my examination and review of the file including treatments rendered for this condition, it is my opinion that this claimant has reached maximal medical improvement and that the condition has become permanent. Based on the AMA Guides tothe Evaluation of Permanent Impairment, Fourth Edition, in my opinion, the impairments of the claimant place her in DRE Lumbosacral Category II and DRE Cervicothoracic Category II using Table 70 (page 108); and using Table 16 (page 57), and Table 3 (page 20); giving her a total combined impairment of 21% whole person for the allowed musculoskeletal conditions in this claim. I feel the claimant could perform work at sedentary work levels with occasional repetitive hand restrictions bilaterally.
(Emphasis sic.)
 {¶ 24} 9. Following a May 26, 2004 hearing, an SHO issued an order awarding PTD compensation starting March 2, 2001, and allocating the award between two industrial claims. The SHO order states:
This order is based particularly upon the report of Dr. May.
Claimant presents a March 2, 2001 report from Charles May, D.O. This report concludes that the claimant is unable to engage in any form of sustained gainful employment as a direct and proximate result of the allowed conditions in the claimant's industrial claims. The Staff Hearing Officer adopts this conclusion contained in Dr. May's report. As Dr. May concludes that the claimant is unable to engage in any form of sustained remunerative employment, such a conclusion mandates an award of permanent total disability compensation without consideration of the [State ex rel. Stephenson v. Indus. Comm. (1987),31 Ohio St.3d 167] factors.
The Staff Hearing Officer has considered the Administrator's concern as to the age of Dr. May's report. In light of the fact that it was submitted with an application which was also made in 2001. It is not outside of rule. In evaluating the credibility of the conclusions in Dr. May's report, the Staff Hearing Officer notes that both of the independent examinations performed on behalf of the Industrial Commission concluded that the claimant was limited to a portion of the range of sedentary activities. Although one of these reports was rejected as technically flawed, that technical flaw was failure to consider a newly allowed condition, so that, if the technical flaw resulted in an inaccuracy in the examining physician's conclusions concerning the claimant's residual functional capacity, that inaccuracy would be to understate the claimant's disability. As both independent examinations come to conclusions reasonably close to the conclusion contained in Dr. May's report, the Staff Hearing Officer finds those examinations booster the credibility of Dr. May's conclusion. Additionally, the claimant has disability attributable to her allowed psychological condition, and that disability was, properly, not the subject of the examining orthopedic reports. Taken together, the Staff Hearing Officer finds that the independent examinations are not inconsistent with the report of Dr. May.
The start date is established at March 2, 2001, the date of Dr. May's report.
The allocation of the award is:
70% to Claim Number 90-48974,
30% to Claim Number OD26505-22.
The greater part of the award is allocated to Claim Number 90-48974 as this was the last injury, it is the claim in which the degenerative disc disease condition is allowed, and it is the claim in which the psychological condition is allowed. Approximately 1/3 of the award is allocated to the occupational disease claim as this is the claim which resulted in the claimant's inability to perform repetitive hand manipulation, a highly significant factor in determining the overall disability of a person who is otherwise limited to (possibly) sedentary work. As it is the combination of claimant's inability to do manual work, the limitations caused by her psychological condition, and her inability to perform highly repetitive or very fine work with the hands, which causes her inability to engage in any form of sustained remunerative employment, the Staff Hearing Officer finds it to be appropriate to allocate the award between these two claims.
Careful consideration has been give[n] to the presentation by the Administrator and the employer that the claimant has very substantial disability arising out of non-allowed, non-industrial medical conditions. After review of the available medical evidence, the Staff Hearing Officer concludes that the allowed conditions disable the claimant from all forms of sustained remunerative employment independently of any disability caused by the numerous, and serious, non-allowed medical conditions.
 {¶ 25} 10. On February 10, 2005, relator, Xerox Corporation, filed this mandamus action.
Conclusions of Law:
 {¶ 26} Three issues are presented: (1) whether Dr. May's failure to sign the March 2, 2001 report requires evidentiary elimination of the report; (2) whether the SHO's statements regarding the allowed psychological condition fatally flaw the PTD award; and (3) whether the commission abused its discretion by allocating 30 percent of the award to claim number OD26505-22.
 {¶ 27} The magistrate finds: (1) Dr. May's failure to sign the March 2, 2001 report does not requires its evidentiary elimination; (2) the SHO's statements regarding the allowed psychological condition do not fatally flaw the PTD award; and (3) the commission did not abuse its discretion by allocating 30 percent of the award to claim number OD26505-22.
 {¶ 28} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 29} Turning to the first issue, it is settled that issues not raised administratively are barred from review in mandamus.State ex rel. Quarto Mining Co. v. Foreman (1997),79 Ohio St.3d 78, 81-84.
 {¶ 30} Claimant filed her PTD application on July 9, 2001. With the application, claimant also filed Dr. May's report of March 23, 2001 in support of the application.
 {¶ 31} Ohio Adm. Code 4121-3-34(C)(1) and (2) provide:
(1) Each application for permanent total disability shall be accompanied by medical evidence from a physician, or a psychologist or a psychiatric specialist in a claim that has been allowed for a psychiatric or psychological condition, that supports an application for permanent and total disability compensation. * * *
(2) At the time the application for permanent total disability compensation is filed with the industrial commission, the industrial commission shall serve a copy of the application together with copies of supporting documents to the employer's representative (if the employer is represented), or to the employer (if the employer is not represented) along with a letter acknowledging the receipt of the permanent total disability application.
 {¶ 32} Here, relator does not claim that it was not served a copy of Dr. May's report or that it was somehow unaware of the report prior to the adjudication of the PTD application. Relator never moved to dismiss the PTD application on grounds that the report submitted in support thereof was not signed by Dr. May.
 {¶ 33} There was a hearing on the PTD application on February 20, 2004 that resulted in an interlocutory order from the SHO regarding Dr. Rutherford's report. Relator was represented by counsel at the February 20, 2004 hearing. There is no indication in the SHO's interlocutory order that relator had challenged Dr. May's report as failing to support the filing of the PTD application. Nor does relator claim here that its counsel challenged Dr. May's report at the February 20, 2004 hearing.
 {¶ 34} The May 26, 2004 hearing before the SHO was not recorded. Hence, there is no transcript of the hearing. While the SHO order of May 26, 2004 indicates that relator's counsel appeared at the hearing, we do not know what he might have argued or said. However, there is no claim here that relator's counsel raised the issue before the SHO regarding Dr. May's failure to sign the report.
 {¶ 35} Based on the record before this court, the magistrate concludes that relator failed to raise the issue administratively despite many opportunities to do so. Accordingly, relator has failed to preserve the issue for review in mandamus. QuartoMining, supra.
 {¶ 36} Nevertheless, even if relator had administratively raised the issue, the commission would have properly held that Dr. May's failure to sign the report does not require evidentiary elimination of the report.
 {¶ 37} State ex rel. LTV Steel Co. v. Indus. Comm. (1999),85 Ohio St.3d 75, is instructive. In LTV Steel, the commission awarded PTD compensation to George Grecu based upon reports from Dr. Kang. Nearly all of Dr. Kang's reports were authenticated with a signature stamp. These reports also contain the stamped statement "[s]igned in my absence to avoid delay in mailing." Id. at 75-76.
 {¶ 38} LTV Steel challenged the PTD award by filing a mandamus action in this court. Viewing the reports of Dr. Kang to be unsigned, this court found that the reports could not constitute evidence upon which the commission could award compensation. On an appeal as of right, the Supreme Court of Ohio held that Dr. Kang's reports should have been considered signed. The court explained:
The appellate court based its decision on several cases that dealt with reports that were completely unsigned. In State exrel. Brown v. Indus. Comm. (1983), 13 Ohio App.3d 178, 179
* * *, the report at issue was dictated "but not read or signed." The court held that an unsigned report could not be proper evidence, stating that "[t]he potential for inaccuracy is too great to depend upon such a statement." 13 Ohio App.3d at 179[.] * * *
In State ex rel. Smith v. Indus. Comm. (1986),26 Ohio St.3d 128, 129 * * *, a workers' compensation case, this court refused to consider as evidence a report that was inscribed "DICTATED BUT NOT READ."
In State ex rel. Case v. Indus. Comm. (1986),28 Ohio St.3d 383, 387 * * *, this court stated that "[i]t is well-settled that an unsigned medical report is not reliable evidence upon which the commission can base its determination as to extent of disability."
The significant difference in this case is that the reports of Dr. Kang are, in fact, signed. The signatures were not made by Dr. Kang's own hand, but they were done at his direction. Under Ohio statutes governing commercial paper (which mirror the Uniform Commercial Code), a signature need not be made by the hand of the signer:
"A signature may be made manually or by means of a device or machine and by the use of any name, including a trade or assumed name, or by a word, mark, or symbol executed or adopted by a person with present intention to authenticate a writing." R.C.1303.41(B).
Pursuant to R.C. 1301.01(MM), "`signed' includes any symbol executed or adopted by a party with present intention to authenticate a writing."
Ohio statutory law on wills, too, does not require a testator's signature to be his own. Pursuant to R.C. 2107.03, the signature of a testator on a will may be made by another person in the testator's presence at the testator's direction.
We see no reason to hold a doctor's report in a workers' compensation case to a higher standard than a piece of commercial paper or a will. We find that a signature-stamped report constitutes a signed report that may be relied upon by the Industrial Commission in deciding whether to award compensation.
We believe that the appellate court overstated the potential problems of signature-stamped reports when it wrote that "[a signature stamp] allows the author to repudiate the report as having been stamped and mailed without his or her approval." In this case, the stamp "Signed in my absence to avoid delay in mailing" indicates that Dr. Kang knew about the signature affixed to the report and intended for it to authenticate the report. A signature stamp provides an indicia of legitimacy that an unsigned report lacks. Also, truly falsified reports would likely bear more damning evidence of unreliability than the mere unauthorized use of a signature stamp. For instance, a lack of consistency with other reports filed by the same doctor, a dramatic worsening of a condition, or the sudden appearance of a new condition would be telling. Also, in the end, each report is subject to repudiation by an opposing party's doctor's report.
Relator did not question the authenticity of the reports at the hearing officer level nor in its appeal to the Industrial Commission. To now allow relator to prevail on this issue would be honoring form over substance. This is especially the case where the procedural posture of the matter leaves the respondent unable to defend the integrity of the document. For instance, in this case, after the record closed, Dr. Kang wrote in a January 16, 1997 letter to claimant's counsel that "the letters you received from this office under my name on behalf of Mr. Grecu are letters that have been sent under my direction and responsibility and, even though the signature was stamped, it is authentic under my authorization."
Id. at 80-82. (Emphasis sic.)
 {¶ 39} Here, Dr. May's report must be viewed has having been signed by Dr. May. Dr. Holtzmeier's signature, which Dr. May authorized, is no less an indicia of legitimacy than the signature placed on Dr. Kang's reports in the LTV Steel case. Moreover, it could be argued that Dr. Holtzmeier's signature, as authorized by Dr. May, gives a greater indicia of legitimacy than the signature stamp placed on Dr. Kang's reports. Dr. Holtzmeier is a physician who practices medicine with Dr. May and who is thus medically competent to review the typed report for any inaccuracies prior to signing. By way of contrast, in LTVSteel, there was no indication that the signature stamp had been placed by another physician who practiced with Dr. Kang. Presumably, Dr. Kang's signature stamp was placed on the report by someone who assisted Dr. Kang in the preparation of his office correspondence.
 {¶ 40} Moreover, the LTV Steel case supports the magistrate's determination that relator's failure to raise the issue administratively precludes the issue here. In this case, relator's delay in challenging Dr. May's report for lack of a signature procedurally leaves the claimant unable to defend the integrity of Dr. May's report. Had relator timely challenged the report administratively, claimant could have asked Dr. May to certify the authenticity of his March 2, 2001 report.
 {¶ 41} The second issue arises because the SHO stated, in addressing the PTD award, that "claimant has disability attributable to her allowed psychological condition." Also, the SHO noted "the limitations caused by her psychological condition" in addressing allocation.
 {¶ 42} Dr. May addresses the allowed psychological condition at two points in his report. Initially, Dr. May states: "[S]he sees Dr. Edmond Goold, a psychiatrist, for her dysthymia, and Dr. Goold prescribes medication for her dysthymic disorder.
 {¶ 43} Claimant's complaints are described in the next paragraph. There, Dr. May wrote: "She has a long list of complaints and symptoms all compatible with depression."
 {¶ 44} In the concluding paragraph of his report, Dr. May opines that claimant is permanently and totally disabled as a result "of the allowed conditions in all the above claims." Significantly, "aggravation of pre-existing dysthymia" is listed as an allowed condition of one of the claims.
 {¶ 45} The magistrate also observes that Dr. May wrote a lengthy paragraph detailing his clinical findings during the physical examination.
 {¶ 46} The magistrate disagrees with the commission's assertion here that Dr. May is not competent to consider the psychological claim allowance in rendering an opinion as to disability. While Dr. May is apparently not a psychologist or psychiatrist, he is competent as a physician to evaluate and opine as to the dysthymic disorder even though he apparently defers to Dr. Goold, who is a psychiatrist, in the treatment of the condition.
 {¶ 47} Given the above analysis, Dr. May's statement "[s]he has a long list of complaints and symptoms all compatible with depression," can be read as a finding that claimant suffers from depression based upon her complaints and symptoms.
 {¶ 48} He apparently attributes her depression to the allowed psychological condition that Again, Dr. May concludes that all the allowed conditions contribute to permanent and total disability. contributes to the inability to perform all sustained remunerative employment.
 {¶ 49} Given the above analysis, it was not necessarily inaccurate for the SHO to refer to "disability attributable to her allowed psychological condition" nor was it inaccurate to note "limitations caused by her psychological condition." Depression, by definition, is a limitation of function.
 {¶ 50} Thus, even though it can be argued that Dr. Goold's prescribing of medication, by itself, is not evidence of disability, Dr. May's finding of depression can be viewed as a limitation of function that contributes to permanent and total disability.
 {¶ 51} The SHO devoted much of his order to an explanation as to how both independent examinations (presumably those of Drs. Rutherford and Stanko) support the credibility of Dr. May's conclusion that claimant is unable to perform any sustained remunerative employment.
 {¶ 52} As previously noted, Dr. Stanko found that claimant was 21 percent whole person impaired solely by the physical claim allowances and that claimant was restricted to "sedentary work levels with occasional repetitive hand restrictions bilaterally." Dr. Rutherford, who failed to examine for one of the allowed physical conditions, found that the allowed physical conditions permit only sedentary work activity.
 {¶ 53} In comparing the reports of Drs. Rutherford and Stanko to Dr. May's report, the SHO makes two salient points. One, Dr. Rutherford's failure to consider a claim allowance could mean that his determination of residual functional capacity is overstated or, put another way, that disability may be understated. Two, Drs. Rutherford and Stanko did not evaluate the allowed psychological condition while Dr. May did.
 {¶ 54} Thus, the SHO endeavored to compare the reports of Drs. Rutherford and Stanko to Dr. May's report. In so doing, the SHO concluded that "the independent examinations are not inconsistent with the report of Dr. May."
 {¶ 55} Read in light of the above analysis, the SHO's statement "the claimant has disability attributable to her allowed psychological condition," is neither inaccurate nor an abuse of discretion. The statement simply explains why Dr. May's report can be read as being consistent with the reports of Drs. Rutherford and Stanko since those two independent examiners did not consider the psychological condition while Dr. May did.
 {¶ 56} The third issue is whether the commission abused its discretion by allocating 30 percent of the award to claim number OD26505-22.
 {¶ 57} According to relator, the commission abused its discretion in allocating 30 percent of the award to claim number OD26505-22 because, contrary to the SHO's finding, there is no evidence of any ability to perform "repetitive hand manipulation." (Relator's brief, at 9-10.) The magistrate disagrees.
 {¶ 58} That portion of the commission's order pertinent to the instant issue states:
* * * Approximately 1/3 of the award is allocated to the occupational disease claim as this is the claim which resulted in the claimant's inability to perform repetitive hand manipulation, a highly significant factor in determining the overall disability of a person who is otherwise limited to (possibly) sedentary work. As it is the combination of claimant's inability to do manual work, the limitations caused by her psychological condition, and her inability to perform highly repetitive or very fine work with the hands, which causes her inability to engage in any form of sustained remunerative employment, the Staff Hearing Officer finds it to be appropriate to allocate the award between these two claims.
 {¶ 59} In his report, Dr. Rutherford states: "It is my medical opinion that she can do no continuous production type activities that involve rapid or repetitive, flexion, and extension of her wrists and hands."
 {¶ 60} In his report, Dr. Stanko states: "I feel the claimant could perform work at sedentary work levels with occasional repetitive hand restrictions bilaterally."
 {¶ 61} In his report, Dr. May states:
* * * She complains that her hands tighten up and complains of loss of dexterity in both hands. She is right hand dominant. She complains of loss of strength in both hands. She has shooting paresthesias into both hands which she describes as being similar to the time prior to her carpal tunnel surgeries. * * *
* * *
* * * There are barely visible carpal tunnel surgical scars over the volar aspect of each wrist. There is no muscle atrophy in the upper extremities. Tinel's is negative as well as Phalen's negative bilaterally.
Neurocirculatory exam in both upper extremities is intact. Range of motion of both wrists and in all digits were satisfactory bilaterally.
Grip strength was diminished on the right compared to the left side.
 {¶ 62} As previously noted, the SHO's order states that it is based "particularly" upon the report of Dr. May. It would be inaccurate, however, to equate this statement with exclusive reliance upon Dr. May's report. As addressed above, the SHO used the reports of Drs. Rutherford and Stanko to support the credibility of Dr. May's report. The SHO did not reject the reports of Drs. Rutherford and Stanko, but simply found them to present an incomplete picture of the four industrial injuries.
 {¶ 63} The reports of Drs. Rutherford and Stanko both, independently and directly, support an "inability to perform repetitive hand manipulation," as stated by the SHO in his order.
 {¶ 64} Given that the SHO determined that the reports of Drs. Rutherford and Stanko are not inconsistent with Dr. May's report, and that the SHO did not reject those reports, relator is clearly incorrect in arguing that there is no evidence to support the commission's 30 percent allocation based in part upon an inability to perform repetitive hand manipulation.
 {¶ 65} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.